Good morning, Your Honours. Marina Kov, the petitioner. May I please the Court? Today we hear an appeal that was brought by a petitioner from the BIA's denial from the appeal filed from the IJ's decision on adverse credibility. The adverse credibility was based basically on five different inconsistencies. Some of them were related to the petitioner's prior testimony during an asylum interview, and some of them were allegedly within the internal inconsistency during the testimony as it related to the declarations. And I would like to address each one of them, if I may, unless the Court has some specific questions. I do have one specific question. Can you address the visa applications? The visa applications? Sure. As I understand it, at least as to one of the visa applications, your client admits or at least the evidence suggests that it wasn't an accurate representation of her reason to want to come to the country. Your Honor, there were two visa applications. Right. One of them was filed in 2000 by an agency. Right. As to that one, she says, I didn't know what they said. As to the second one, however, which she appears to have filed, she said that she was just later on said she was just trying to find a way to get into the country, which is inconsistent with the application, which is for another purpose. So why isn't that something that casts doubt on her credibility? Well, she was trying to — there were actually a few testimonies in regards to that, Your Honor. At some point she said that she was coming, she wanted to come to the country and tour the country. Then on the visa application she indicated that she was coming for a wedding. When that question was asked — All right. And that statement apparently was not true, correct? Well, she testified that there was two different reasons. You know, she wanted to tour the country and she wanted to come for the cousin's wedding or friend's wedding. Well, we go back to the first one. The first one says she's part of some performing group, right? It wasn't her who's — I know. And so she says, I didn't say that, the agency said that. Correct. And she files a second one that says, I'm coming to go to a wedding. And she says — but she admits later, I was just trying to get into the country. So as to that second one, it seems to me it casts some doubt on your client's credibility, doesn't it? When you say she wanted to get into the country, she wanted to come to the country. You know, I'm not sure what — you know, the visa application or testimony is not transcribed. So I'm not sure how exactly it was recorded by the officer, the asylum officer. You know, this is based on any other statements during the asylum interview or the airport interview. We don't know how good the translation was. I don't know whether the officer understood correctly. But her — you know, what — from what I can see, because there were no question and answer written down, you know, completely. It was just a short, brief summaries. So she basically said that she wanted to get into the country because she wants to tour the country and also come for the wedding. So this is a post-Real ID Act case, right? Correct. So the inconsistencies don't have to go to the heart of the asylum claim. That was rejected by Congress. Correct. But it also — if it's a trivial inconsistencies that don't really — In Shretha, we said, well, if it's a — just a scrivener's error or some sort of very minor immaterial, like you get the date, you get the number of the street address or whatever wrong, then that shouldn't be substantial evidence. But we've also said that even one inconsistency is enough to be substantial evidence to support the IJ's determination. Isn't that right? And here there were multiple inconsistencies identified by the IJ. That's correct. But that's also — if you perceive that as an inconsistency, if I may address each one of them, I can — So you have an explanation for each one of them, but she had an opportunity to explain, and the IJ didn't credit her explanation. Some of the explanations were not very clear. So to me, the key issue — and perhaps you could address this — is the confusion about when, I guess it's Zerabian came to the office. Did he come twice? Did he come once? Was it telephones? What date? And she gives an explanation which doesn't really clarify which sequence of events is correct, and the IJ and the BIA note the discrepancy. And I guess I don't understand why that wouldn't be sufficient, given that that's one of the key events in her explanation. Yes, Your Honor, I will address that. The actual — you know, the government attorney was addressing this issue by comparing it to the declaration that it's on pages 462 through 468. That's not the — so she had two statements. She had — the first statement was at 631 to 633, and that was the amended statement where she was trying to clear up some problems in the first statement, correct? Correct. Because the first one was written by somebody who was not very fluent in English, and it was a very, you know, unreadable declaration, if I may — But that's — isn't that what the IJ is there for, to listen to that explanation and see whether or not he credits it? Yes, and — And he didn't credit that explanation. He thought there were discrepancies that went to your client's credibility. What do we do in the post-real ID with that? But that's what we argue. The petitioner is arguing that this is not the IJ error in that, because there was no discrepancy between the declaration and her testimony, because she testified that while she was working on the 29th — the night from 29th of February to 1st of March, late, she overheard the conversations on the phone between the leaders of her party and Zarubin, and then he came to the office physically. And then there were a lot of exchanges during the testimony, and those questions were asked, and she kept coming back to the same answer. I was there. There were first conversations on the phone, a number of them. And then afterwards, Zarubin came in. So the trial attorney asked questions whether they came together. For some reason, the trial attorney understood that they came together. She never testified to that. You know, I was trying to make these things line up, and they didn't exactly line up. So in her second written statement, she said on the night of February 29th to the morning of March 1st, Zarubin came to the office. Then in her testimony and had a private conversation, and that was when they asked for the financial books, and then her testimony from November 15th, it says that Zarubin came to your office at 3 p.m. on March 1st, 2008, and she says, oh, well, he came two times. And then she has a further explanation for that, but I didn't see any way to make them line up. I mean, do you have now a specific chronology of exactly what happened? I believe that she, when she said she came two times, I think she meant, because right after that, and that was on the same page that I just mentioned, she never, what she said, she corrected herself afterwards. She said they were on the phone first, and then he came in. He didn't come twice. She meant that they were there the first time, and they were talking to him on the phone, and then he came in later. And that's, it went through, you know, if you read all of the two pages from 264 to 266, at the very end, you know, after she couldn't get the question, you know, she couldn't understand what the trial attorney was asking her. So at the end, when that question was asked again, she answered, on the 29th they were on the phone, they were, they had phone conversation, and then physically he arrived on March 1st. But that's contrary to what she said in her second statement. But it's not, Your Honor. If you, the way. She said, then on the night of February 29th, 2008, till the morning of March 1st, while working late at the ARP office, Zarabian came to the office and had private conversation. And I understand how it may be read, but what she probably, the way it was, the way I read it, is that when she was working late from February 29th to March 1st, while working late at the ARP office, Zarabian came to the office and had private conversations. So. Until 3 p.m. the next day. But she said that that's not what she meant, that he came that night. You know, it was, she explained that to the judge and to the trial attorney, but that he came later. He was on the phone, you know, that night, you know, with the party leaders. But he came later. We've taken you over your time, but we'll give you a minute for rebuttal. I'm sorry. Thank you. May it please the Court. My name is Jesse Lorenz, and I represent the Attorney General of the United States. This Court should decline to disturb the Board's decision because record evidence does not compel the conclusion that Petitioner presented a credible claim for asylum, withholding of removal, and cat protection. Let me ask you sort of a global question here. There are some inconsistencies in various statements made by the Petitioner, but her story over time is pretty consistent. She gets some of the details wrong, and she does have some evidence that she was persecuted. She's got people who said that she had injuries. Under the REAL ID Act, are any of these single inconsistencies enough, or are you arguing that these minor inconsistencies together support the case? And if so, what's our dividing line? I know that's a broad question, but one of the difficulties here is there's no sort of glaring smoking gun where you can say, aha, she said she was in Armenia one day, and it turns out she was in Moscow. There's inconsistencies as to date and descriptions of the events, but they're broadly consistent. So how do we deal with a case like that? Well, Your Honor, under the REAL ID Act, you must consider, or the Immigration Judge and Board, consider the totality of the circumstances in rendering an adverse credibility determination. As Judge Ikuda mentioned earlier, one inconsistency is enough. And I would posit here that these inconsistencies went to material aspects of her claim. Which one? If we had the one is enough rule, which one is enough here? Well, I think the worst, or I guess for lack of a better term, the worst inconsistency is the discussion about when the opposition party leader came to meet with her party's leadership. From the testimony and the different evidence presented, we're not really sure when that happened. In one telling of the story, he came either late evening or early morning, March 1st, and was there from the evening to the morning. In another telling, there was a phone conversation between the party leadership on February 29th, and then he came on 3 p.m. on March 1st. And then in another, there was an evening meeting in person and then another meeting in person on March 1st. And this is, you know, a big part of her claim. I mean, this is the day that she allegedly witnessed all this financial corruption where one party was buying off the other party. These are memorable events. But the dates are roughly consistent. I mean, she says these events occurred on leap year day, I guess, and March 1st. And she says at one point he arrived at one point, and another time he called first and then arrived. They're inconsistent. I don't doubt there's inconsistencies. But are these really material inconsistencies? Well, Your Honor, yes, I would argue that they are. It's just, as I said, this is a very important event to her claim. And just the fact that it's been sliding, the shifting testimony has kind of been sliding around. It's unclear exactly what happened. And, again, you consider all these inconsistencies in the totality of the circumstances. And there are some other inconsistencies. She presented inconsistent evidence about when she first spoke out about witnessing election fraud. We don't know if she did that the day after the election or several days after the election at March 3rd. She was inconsistent about when she wrote a report or even if she did write a report, did she write a letter? Was this an oral report? Again, when was that report? Was it the day after the election? Was it later on at a March 3rd meeting? Again, the inconsistency about when the party leadership came into the office, her shifting claim about how many officers arrested her. Was it two or three? There were also a lot of discrepant statements about who treated her after she was released from detention. Let me ask you about that. Going back to these asylum interviews, was there an Armenian translator there? According to the asylum officer, there was. There was an interpreter. The petitioner said during her testimony before the immigration judge that she understood the interpreter. There was also an interpreter's monitor who, again, would have spoke Armenian and monitored the situation. The reliance on the asylum officer's notes in this case is consistent with this Court's case law. There was, as I said, there was a record of the questions and answers during the asylum interview, the asylum interview or the asylum officer's notes. The record indicates that petitioner was placed under oath during this asylum interview. The asylum officer testified at petitioner's merits hearing, and petitioner had the opportunity to cross-examine her about any of these inconsistencies. Petitioner was also given a chance to ---- Oh, excuse me. The petitioner has the ability to cross-examine who? The asylum officer during the ---- Oh, at the IG hearing, not at the merits hearing. Yes, yes. When they called the asylum officer during her merits hearing or one of the continued merits hearings, she had the opportunity to cross-examine her and did, in fact, cross-examine her. And I take it the asylum officer was testifying from her notes? I believe that that's my understanding, yes, that she had her notes in front of her. The asylum interview happened several years prior to the testimony before or a year or two prior to the testimony before the immigration judge. And, you know, sometimes these dates become less significant when there's a big time gap between the occurrence and when they had the asylum interview. But in this case, it was just a matter of a few months. Is that right? Well, my understanding was the asylum interview happened sometime in 2010, and all of these events allegedly happened in 2008. So there was not a huge gap in time between the two. Again, getting back to the discrepancies about who treated her, like I said, she initially reported it was a doctor. Then she later said it was a nurse. And there's some inconsistent testimony about when she was treated. Was it once or twice? And some of these dates, they kind of make other things almost impossible to have happened. Like, for example, she testified that on March 17th she was released from detention. She was bedbound for 10 days. But this would conflict with her testimony that the police shut her business down on March 23rd. She can't be in both places at the same time. The other inconsistencies that really impacted her credibility as a witness were the inconsistencies about her prior visa applications. I think the striking thing here is that when she was asked about it at her asylum interview with the asylum officer, she denied applying for these two visas. After even being confronted with the visas themselves, she still denied that these were hers. And then later she admitted that she was concerned that they would negatively impact her asylum claim. So I think these are big, important visa or these are ‑‑ Go back to the second visa, if you would. The second visa indicates she wants to come to the country for what reason? I believe the second visa said that she wanted to come to a wedding. And I think the reason that this inconsistency is so important is when she testifies before the immigration judge, in the context of her testimony, she says, I didn't have any family here. I don't have any friends here. We have some direct family, but we don't stay in touch with them. And I have a father's friend, and now I want to attend a wedding. Well, that's what I wanted to ask, because your opponent said roughly she attended a wedding and then also wanted to stay. But I thought that the evidence in this case was that there wasn't really a wedding at all. Well, that's the ‑‑ Or could be inferred from her testimony. I think that's the issue. We don't know. And it's her burden of persuasion to prove that she's eligible for asylum or to prove that she's a credible witness. And these kind of things cast doubt on her veracity as a witness. We really don't know why she wanted to come in 2004. Was it to sightsee? Was it to see her cousin, to go to her cousin's wedding? I mean, she just stated that she didn't have any direct family or any family that she was close to in the United States. So it's kind of confusing. And like I said, it's her burden to prove that she's a credible witness. Your Honors, if you don't have any further questions. All right. Thank you. Thank you. We'll give you a minute for rebuttal. All the inconsistencies that were mentioned just now by my opponent, they're all minor and they're all trivial. They really do not add anything or take it away from asylum applications that she had. The two police officers or three police officers, you know, she testified credibly and consistent with the declarations that it was three police officers. Then that it was the nurse and not the doctor who treated her. And there was no reason why she would lie about it. She didn't have a medical report. So it's not that she wanted to provide a medical report to show that it was a doctor. You know, there was no reason for that. Now, there was an argument that there was a lot of inconsistency in terms of the letter, whether she reported through a letter or reported verbally. She was consistent with her testimony that she reported almost three times about this when she confiscated the ballots, she took it to the leadership. Then the next day, she discussed that and talked about it and made a report about this fraud. And the third time, it was when she generally talked about what was going on, you know, within the leadership on March 3rd after what events took place on 29th and the 1st. And you have to also, the inconsistency regarding the, really quickly, regarding the date of the 17th and the 18th, it happened, you know, she was released at night. She came in, you know, she came home on the 17th at night, beat up, you know, it could have been that it was on 17th to 18th and the nurse or the aunt who wrote the letter, you know, we don't know that. Thank you. Thank you, Your Honor. Okay, the case of Zakarian v. Lynch is submitted. The next case, United States v. Ruiz, is submitted on the briefs and we'll next hear argument in RINCON, the American Federation of State, County, and Municipal Employees.
judges: Ikuta, Hurwitz, Melloy